UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JASON SCHWARTZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:23-cv-02037-TAB-JMS |
| | ) | |
| LISA HAMBLEN, | ) | |
| GRACE, | ) | |
| JOHNNA, | ) | |
| CONIGLIAO, | ) | |
| M. SOMMERS, | ) | |
| HOUK, | ) | |
| ADEFILA, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

Plaintiff Jason Schwartz, *pro se*, alleges in this 42 U.S.C. § 1983 lawsuit that Defendants

violated his Eighth Amendment rights by deliberately delaying and denying medical care for his

seizures in July and August of 2023 when he was incarcerated at Pendleton Correctional Facility.

Schwartz sues two groups of Defendants.  The "Medical Defendants," the first group, are Lisa

Hamblen, Johnna Fritch, Shadaya Conigliaro, and Jennifer Grace.  The "Custodial Defendants,"

the second group, are Mackenzie Houk, Meghan Sommers, and Adefemi Adefila.  Medical

Defendants Hamblen and Fritch and all Custodial Defendants moved for summary judgment,

arguing that, as a matter of law, they were not deliberately indifferent to any serious medical

need of Schwartz.  For the reasons discussed below, Hamblen and Fritch's motion for summary

1

judgment, dkt. [85], is granted, and the Custodial Defendants' motion for summary judgment, dkt. [73], is granted as to Sommers and denied as to Houk and Adefila.

Schwartz's motion for case status, dkt. [92], is granted to the extent that the Court issues this order.

## I.
## Factual Background

Because Defendants moved for summary judgment under Rule 56(a), the Court views and recites the evidence in the light most favorable to Schwartz and draws all reasonable inferences in his favor. *See Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572–73 (7th Cir. 2021).

### A. The Parties

Schwartz is a prisoner in the custody of the Indiana Department of Correction. During the events at issue in this lawsuit, Schwartz was housed in G Cellhouse, a restrictive housing unit located within Pendleton Correctional Facility ("Pendleton"). Dkt. 74-1 at 10: 8-13. Schwartz has experienced seizures since birth. *Id.* at 6:12-21. At all relevant times, Schwartz was prescribed medications to prevent and mitigate the seizures. *Id.* at 6:22–7:6.

As to Defendants, Sommers and Houk were correctional officers, and Adefila was a correctional sergeant at Pendleton. Dkt. 74-2 ¶ 2; dkt. 1 at 2. Hamblen is a licensed social worker who worked as the health services administrator at Pendleton. Dkt. 85-1 ¶¶ 1–2. As the health services administrator, Hamblen ordered medical supplies, hired nursing staff, handled human resources issues for the medical staff, and served as a liaison between the prison administration and the medical department. *Id.* ¶ 3. Sometimes, Hamblen assisted the grievance staff in investigating inmate grievances involving medical care and providing information from the inmate's medical records. *Id.* Hamblen did not have a clinical role, determine medical care,

or oversee medical treatment. *Id.* ¶ 7. Fritch is a registered nurse who worked as the director of nursing at Pendleton. Dkt. 85-2 ¶¶ 1–2. As the director of nursing, Fritch oversaw the nursing staff but did not determine medical treatment for patients. *Id.* ¶ 5.

## B. Schwartz's Seizures

Around 3:30 a.m. on July 31, 2023, Schwartz experienced two serious back-to-back seizures. Dkt. 74-1 at 8:12-23. During the second seizure, Schwartz fell and hit his head on the cell door. *Id.* at 8:19-23. Afterwards, Schwartz could barely talk and had to hold the cell door for stability. He yelled for officers to help him. Dkt. 1 at 4. Around 4:42 am, Adefila came by his cell. *Id.*; dkt. 74-1 at 9:11-20. While still struggling to speak and stand, Schwartz told Adefila that he needed medical assistance because he had a seizure and fell, injuring his head, neck, and arm. Dkt. 74-1 at 9:21–10:2; 9:16-20; 12:6-15. Adefila refused to call for medical assistance because he was about to start serving breakfast. *Id.* at 10: 3-5. Adefila told Schwartz, "I'm not calling medical. I've got better things to do." *Id.* at 10:5-7. Schwartz testified that Adefila knew that he was epileptic because Adefila escorted the nurses who dispensed his medications and because he regularly worked in G Cellhouse, where Schwartz had and reported past seizures. *Id.* at 12:17-21, 13:22-25.

In the afternoon on July 31, Schwartz experienced another seizure. *Id.* at 12:24–13:6. Later that day, Sommers came to Schwartz's cell, and Schwartz told her about the three seizures he had that day. *Id.* at 13:6-11. Sommers told him to stop complaining and to fill out a healthcare request form. *Id.* at 13:11-13. Schwartz explained that he had hurt his neck from the earlier seizure, but Sommers refused to call for medical care. *Id.* at 13:19–14:2. Schwartz eventually filled out a healthcare request form for the seizures. *Id.* at 14:16-17.

3

That same week, Schwartz experienced seven or eight additional seizures. Dkt. 74-1 at 15:11-17. Schwartz reported his seizures to another officer, Houk, and asked her to call medical. *Id.* at 15:18-19. Houk refused and told Schwartz to stop "bitching" and "crying" about his seizures. *Id.* at 15:20-23. When Schwartz told Houk about having a seizure on August 1, Houk refused his request for a healthcare request form and told Schwartz to "leave her the fuck alone." Dkt. 1 at 5.

### C.  Schwartz's Medical Care

In general, "[t]he policies in place within [Pendleton] at all relevant times created two potential responses for correctional staff if an offender requested medical treatment or assistance." Dkt. 74-2 ¶ 9. For serious issues such as emergencies requiring immediate response, such as an open wound or a non-responsive inmate, the policy requires officers to hit a "Signal 3000." Dkt. 74-1 at 10:19-25; dkt. 74-2 ¶¶ 10, 15. If officers determine there is no immediate threat to the inmate's health and safety, the policy requires them to call medical staff at the next possible opportunity. Dkt. 74-2 ¶ 11. To call medical staff, officers must leave the range and personally call the medical staff to inform them of the complaining inmate, the details of the complaint, and the visible status of the inmate when the officer spoke to him. *Id.* ¶ 12. Then, the medical staff would determine how to respond to the inmate's request for medical care. *Id.* ¶ 13. Additionally, inmates can fill out healthcare request forms, and medical staff must respond within a specified time frame based on the complaint's severity. Dkt. 74-1 at 15:5-10; *see also* dkt. 85-1 ¶ 10.

Schwartz submitted several healthcare request forms, letters, and request for interview forms related to his medical care following the above-described seizures. At Pendleton, submitting a healthcare request form is an appropriate way to seek healthcare, but submitting a

4

letter or request for interview form is not.  Dkt. 85-1 ¶¶ 10, 16.  When an inmate submits a healthcare request form, nursing staff triage the request to determine whether it can be resolved with a written response or requires an appointment with a nurse or other medical provider.  Dkt. 85-1 ¶ 10.

Hamblen only received healthcare request forms when nursing staff forwarded them to her because they involved one of her duties as the health services administrator, such as procuring medical supplies.  *Id.* ¶ 14.  Even though inmates often addressed letters and healthcare request forms to her, they did not automatically go to her.  *Id.* ¶ 15.  Request for interview forms addressed to Hamblen went to her assistant, who reviewed and responded to them.  *Id.*  When the request for interview forms made it to Hamblen, she reviewed the patient's medical records and then responded.  *Id.*  Similarly, Fritch only received healthcare request forms when nursing staff forwarded them to her because they fell under her duties as the director of nursing.  Dkt. 85-2 ¶ 7.  At some point, Fritch told Schwartz that she and Hamblen try to keep an eye on whether healthcare request forms are answered.  Dkt. 74-1 at 24:4-11.

Schwartz submitted two healthcare request forms on July 31, 2023, asking for medical care for his seizures and the resulting head and neck injuries.  Dkt. 85-3 at 1–2.  The first request was received on August 1 and responded to on August 10 by nurse Lindsey Cottrell.  *Id.* at 1.  Cottrell noted that she saw Schwartz for a nursing sick call on August 10.  *Id.* at 1, 11.  The second request was received on August 3 by nurse Jessica Kimble, who responded "noted."  *Id.* at 2–4.  On August 4, nurse practitioner Vernon Osborn examined Schwartz for issues related to Pendleton's drinking water.  *Id.* at 5–8.  However, Schwartz's seizures were also discussed.  During this visit, Osborn increased Schwartz's seizure medication and ordered baseline lab work.  *Id.* at 6.

Schwartz submitted another healthcare request form on August 9, stating that he had two seizures that evening, and despite notifying officers, he had not received any medical care. *Id.* at 10. The August 9 request was received on August 14 by Kimble, who wrote "noted." *Id.* On August 10, Cottrell conducted a nursing sick call to assess the seizures and issues with Schwartz's drinking water. *Id.* at 11–12.

On August 12, Schwartz submitted another healthcare request form, stating that he was still waiting to be seen for his injuries from the July 31 seizures. *Id.* at 13. This request was received by Kimble on August 14, who noted that Schwartz was seen on August 10. *Id.* On August 12, Schwartz also wrote a letter to Hamblen, telling her about his seizures and injuries during the week of July 31. Dkt. 88-1 at 4. Schwartz stated that Cottrell told him on August 10 that Hamblen would determine whether he gets X-rays and that the medical staff are not required to respond to every healthcare request form. *Id.* He stated that he planned to file grievances about the medical staff. *Id.* Hamblen denied having any record of this letter and stated that, if she had received it, she would have taken no action because the letter merely informed her that Schwartz planned to file grievances. Dkt. 85-1 ¶ 18. On August 12, Schwartz also wrote a letter to Fritch telling her about his seizures. Dkt. 88-1 at 6. He stated that the nurses told him that she and Hamblen "run medical" and decide which healthcare request forms are answered. *Id.* He then asked why he was not receiving medical care for his head and neck injuries. *Id.* Fritch denied having any record of this letter and stated that, if she had received it, she would have sent him a blank healthcare request form. Dkt. 85-2 ¶ 9. Fritch denies that she or Hamblen decide which healthcare requests are answered. *Id.*

Schwartz wrote letters to Fritch on August 20 and September 1 and to Hamblen on August 15, August 22, and August 25. Dkt. 88-1 at 1-2, 5, 11; dkt. 85-5. In the letters, Schwartz

6

reported recent seizures and related pain and complained of the lack of treatment, X-rays, or pain medication. *Id.* Both nurses denied having any record of receiving those letters but stated that, if they had, they would have sent Schwartz healthcare request forms. Dkt. 85-1 ¶¶ 19–21; dkt. 85-2 ¶¶ 11–12. Schwartz sent a request for interview form to Hamblen on September 7, which she received and responded. Dkt. 88-1 at 3. The letter stated that Schwartz had two seizures on July 31 and saw medical staff on August 10, but nothing was done for him. *Id.* After checking Schwartz's medical records, she advised him to submit a request for healthcare form. *Id.*; dkt. 85-1 ¶ 22.

Dr. John Mershon treated Schwartz on September 19. Dkt. 85-3 at 20. Schwartz reported that he no seizures since his medication was increased on August 4. *Id.* Schwartz complained about neck pain after an "affair with custody." *Id.* Dr. Mershon prescribed Tylenol for the neck pain. *Id.* at 21.

Schwartz sent a request for interview form to Hamblen on September 24, reporting seizures and asking for medical help. Dkt. 88-1 at 12. Hamblen has no record of receiving this letter, and as noted above, if she had, she would have told Schwartz to fill out a healthcare request form. Dkt. 85-1 ¶ 23.

On November 20, Hamblen completed a medical history form for Schwartz, noting that he was a chronic care patient due to his seizures. Dkt. 85-3 at 28. On November 22, Schwartz was taken to St. Vincent Hospital after he reported seizing, falling, and hurting his neck. Dkt. 85-3 at 29. The hospital completed CT scans of his neck and head, which showed degenerative changes in the neck, but no fractures or internal bleeding. *Id.* at 33–36. He was discharged and sent back to Pendleton the same day. *Id.* at 41. The hospital physician recommended continuing Schwartz's seizure medication as prescribed and giving Tylenol or Ibuprofen for pain. *Id.*

7

On November 24, Schwartz submitted a request for healthcare form, stating that he had a seizure on November 21 and that his leg was injured from the shackles used to transport him to the hospital on November 20. *Id.* at 55. The request was received on November 28. Nursing staff saw Schwartz on December 1 and treated his wound. *Id.* at 52

## II.
## The Custodial Defendants

The Eighth Amendment's prohibition against cruel and unusual punishment imposes a duty on the states, through the Fourteenth Amendment, "to provide adequate medical care to incarcerated individuals." *Boyce v. Moore*, 314 F.3d 884, 889 (7th Cir. 2002) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). "Prison officials can be liable for violating the Eighth Amendment when they display deliberate indifference towards an objectively serious medical need." *Thomas v. Blackard*, 2 F.4th 716, 721–22 (7th Cir. 2021). "Thus, to prevail on a deliberate indifference claim, a plaintiff must show '(1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent.'" *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021) (quoting *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016)). Deliberate indifference requires more than negligence or even objective recklessness. *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 241 (7th Cir. 2021). Rather, Schwartz "must provide evidence that an official actually knew of and disregarded a substantial risk of harm." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016).

Additionally, courts have "'long recognized' that correctional institutions typically 'engage in the division of labor' between medical professionals and other security and administrative staff." *McGee v. Parsano*, 55 F.4th 563, 569 (7th Cir. 2022) (quoting *Miranda v. County of Lake*, 900 F.3d 335, 343 (7th Cir. 2018)). Thus, if an inmate is receiving care from medical professionals, non-medical prison staff may defer to their medical judgment unless the

8

"official had reason to know that the[ ] medical staff w[as] failing to treat or inadequately treating an inmate." *Id.* (quoting *Miranda*, 900 F.3d at 343).

The Custodial Defendants argue that they did not violate Schwartz's Eighth Amendment rights because Schwartz did not have an objectively serious medical need and, even if he had an objectively serious medical need, they did not consciously disregard a serious risk to Schwartz's health. Dkt. 75 at 7–8. Instead, they stayed in their role as custodial officers who do not have medical training or the authority to provide medical care. *Id.* at 9–10. Schwartz argues that a seizure is an objectively serious medical condition. Dkt. 81 at 5. He also designates testimony demonstrating that he notified the Custodial Defendants of his seizure activity yet they refused to help. *Id.* at 7–9.

Drawing all reasonable inferences in Schwartz's favor, a reasonable jury could conclude that Schwartz had an objectively serious medical condition. As Schwartz argues, seizures are serious medical conditions because they impact day-to-day life and, if left untreated, can be life threatening. Dkt. 81 at 4–5. A seizure is a medical condition that "a reasonable doctor or patient would find important and worthy of comment or treatment" and would "significantly affect[] an individual's daily activities." *Gray v. Hardy*, 826 F.3d 1000, 1006 (7th Cir. 2016); *see also King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012) ("Medical conditions much less serious than seizures have satisfied the standard" for deliberate indifference). Importantly, "[a] medical condition need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated." *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010). Here, having frequent seizures and the resulting bodily injuries could lead to unnecessary pain and further injury, not to mention death.

9

Regarding the subjective component of the Eighth Amendment inquiry, a reasonable jury could conclude that Adefila and Houk were deliberately indifferent to Schwartz's medical needs. The Custodial Defendants argue that there is no evidence that they knew Schwartz needed medical help and that they cannot be expected to provide medical care because they are not medical providers. Dkt. 84 at 7–8. However, as Schwartz points out, the Custodial Defendants ignore key testimony that suggests that each Defendant had notice. As seen above, Schwartz testified that he told each Defendant that he had a seizure and was injured in the resulting fall. Moreover, when Schwartz talked to Adefila on July 31, Schwartz's need for medical care was obvious. He was barely able to talk, hanging on to the cell door, and slurring his words from having had back-to-back seizures. Even still, after communicating with Schwartz, hearing his complaints, and seeing his condition both Adefila and Houk offered no assistance. They refused to call a Signal 3000 or notify medical staff personally, or even to give Schwartz a healthcare request form. Interpreting this evidence in a light most favorable to Schwartz, a reasonable jury could conclude that Adefila and Houk knew about Schwartz's serious medical condition yet refused to seek medical care for him. *McGee*, 55 F.4th at 569. Thus, Adefila and Houk have not shown that they are entitled to judgment as a matter of law.

In contrast, a reasonable jury could not conclude that Sommers displayed deliberate indifference. Although Sommers had the same verbal notice about Schwartz's seizures, she did not witness the secondary symptoms, such as his difficulties standing and speaking, like Adefila did. Therefore, since the undisputed record shows that Schwartz was up and talking to Sommers, she was not put on notice that Schwartz was experiencing a medical emergency, which would require calling a Signal 3000. Moreover, unlike Houk, she directed Schwartz to fill out a healthcare request form to get the medical care that he needed, which Schwartz did. This action

10

demonstrates that Sommers at least attempted to direct Schwartz toward receiving appropriate healthcare. *See Rasho v. Jeffreys*, 22 F.4th 703, 710–11 (7th Cir. 2022) (evidence that a defendant took reasonable measures to address a risk, even if she was ultimately unsuccessful, negates an assertion of deliberate indifference). Although Sommers could have called the medical provider directly, "the mere failure of the prison official to choose the best course of action does not amount to a constitutional violation." *Id.* at 710.

Accordingly, the Court denies summary judgment for Adefila and Houk. The Court grants summary judgment for Sommers.

### III.
### Hamblen and Fritch

The same Eighth Amendment standard applies to Hamblen and Fritch. Additionally, Defendants cannot be held liable for their subordinates' constitutional violations under a theory of *respondeat superior*. *See Chaves v. Illinois State Police*, 251 F.3d 612, 651 (7th Cir. 2001). Administrative officials are not personally liable for simply acting within the scope of their administrative duties. *Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009) (explaining that "bureaucracies divide tasks; no prisoner is entitled to insist that one employee do another's job. The division of labor is important not only to bureaucratic organization but also to efficient performance of tasks; people who stay within their roles can get more work done, more effectively, and cannot be hit with damages under § 1983 for not being ombudsmen."). Liability arises, however, when an administrator "knows about unconstitutional conduct and facilitates, approves, condones, or turns a blind eye to it." *Perez v. Fenoglio*, 792 F.3d 768, 781 (7th Cir. 2015) (internal citations and quotations omitted). "[O]nce an official is alerted to an excessive risk to inmate safety or health through [an inmate's] correspondence, refusal or declination to exercise the authority of his or her office may reflect deliberate disregard." *Id.* at 782 (finding

11

that prison officials may be personally liable where plaintiff submitted "coherent and highly detailed grievances and other correspondences" showing that he did not receive treatment for serious hand injuries).

In this case, the letter that Hamblen received on September 7 would allow a jury to infer that Hamblen knew about the lack of medical care for Schwartz's seizures. Nevertheless, a reasonable jury could not conclude that Hamblen disregarded or turned a blind eye to the serious risks to Schwartz's health. This is because Hamblen reviewed Schwartz's medical records and determined that he had seen medical providers on August 4 and 10. Hamblen also instructed Schwartz to submit a request for healthcare form if he required additional treatment for his seizures. Based on the record, Hamblen did not have the authority to tell medical staff how to treat Schwartz or to treat him herself. As such, even if Hamblen did receive each letter that Schwartz sent, she would have only been able to direct him to file another healthcare request form.

Additionally, there is also no admissible evidence that Hamblen had anything to do with when and how medical staff responded to Plaintiff's healthcare request forms. Though Schwartz points to his letters stating that Hamblen "runs medical" and nurses told him that Hamblen makes decisions about X-rays and when to respond to healthcare request forms, these are hearsay statements. *See MMG Fin. Corp. v. Midwest Amusements Parks, LLC*, 630 F.3d 651, 656 (7th Cir. 2011) ("A party may not rely on inadmissible hearsay to avoid summary judgment."); *see also* Fed. R. Evid. 801, 802. The evidence shows only that at some point Fritch told Schwartz that she and Hamblen kept an eye on whether healthcare request forms are answered. Dkt. 74-1 at 24:4-11. However, "keeping an eye" on whether these forms are answered does not encompass the authority to dictate medical care. Moreover, each of Schwartz's healthcare

12

request forms in the record was answered by nurses.  Thus, Hamblen acted within the scope of her duties, and a reasonable jury could not conclude that she was deliberately indifferent to Schwartz's medical needs.  *See Burks*, 555 F.3d at 595.

The same rationale applies to Fritch.  The record is less clear on whether Fritch even knew about Schwartz's requests for healthcare related to his seizures.  Assuming that she had the requisite awareness, there is still no evidence that Fritch facilitated or condoned the deprivation of medical care or refused to act within the scope of her authority.  *See Perez*, 792 F.3d at 781. That is because, like Hamblen, there is no admissible evidence that Fritch had anything to do with responding to Schwartz's healthcare request forms or his clinical treatment.  As seen above, even though Fritch was the director of nursing, she cannot be liable for her subordinate nurses' misconduct, if any, under a theory of *respondeat superior*.

Accordingly, the Court grants summary judgment for Hamblen and Fritch.

## IV.
### Conclusion

Schwartz's motion for case status, dkt. [92] is granted to the extent that the Court issues this order.

The Custodial Defendants' motion for summary judgment, dkt. [73], is granted as to Sommers and denied as to Adefila and Houk.  Hamblen and Fritch's motion for summary judgment, dkt. [85], is granted.  Partial final judgment shall not issue at this time.

The **clerk is directed** to terminate Sommers, Hamblen, and Fritch as Defendants on the docket.  The **clerk is directed** to update the docket to reflect that the Defendants' names are as follows: Adefemi Adefila, Mackenzie Houk, Shadaya Conigliaro, and Jennifer Grace.

Schwartz's Eighth Amendment claims against Adefila, Houk, Grace, and Conigliaro must be resolved through settlement or trial.

If Schwartz wishes to be represented by counsel for the remainder of the proceedings, he shall file a motion for assistance recruiting counsel by August 28, 2026.  The **clerk is directed** to send Schwartz a motion for assistance recruiting counsel with his copy of this Order.

IT IS SO ORDERED.

Date 8/12/2026

_____
Tim A. Baker
United States Magistrate Judge
Southern District of Indiana

Distribution:

JASON SCHWARTZ
137123
INDIANA STATE PRISON
INDIANA STATE PRISON
Electronic Service Participant – Court Only

All ECF-registered counsel of record via email